## McKEEGAN v. O'NEILL.

1. A person may bind himself to dispose of property by will in a certain way or to certain parties, and, failing to do so, his agreement, if clearly established, may be enforced after his death against his legal representatives.

2. Agreements or contracts at law and in equity defined and classified.

3. The intention of parties to a contract, so far as it depends upon the construction of a letter, is a question of law and not of fact.

4. A party in possession of a farm, "Cloney," in Ireland, proposed to his

uncle, the owner in fee, to rent Cloney, and afterwards, learning that his uncle wished to sell, begged to be allowed to purchase, leaving the price to be named by the uncle; in reply, the uncle wrote to his nephew that he would sell to the nephew for "£1400 sterling cash, to any one else it will be £1500, *but you get all I am worth at my death.*" *Held*, that the clause italicised was only the expression of an intention on the part of the uncle and not a contract to give his entire estate to this nephew in consideration of the purchase of this land; and the nephew having stamped this letter with an agreement stamp, and completed his purchase at £1400 cash, and after his uncle's death brought action to recover the uncle's entire estate from those to whom it had been given by will, the complaint was dismissed.

5. The real value of Cloney, and the effect upon that value of the tenant's rights of the nephew and his mother under the laws of force in Ireland, do not affect this contract, which was nothing more than an offer made and accepted for the sale of Cloney at £1400.

Before KERSHAW, J., Charleston, February, 1884.

This was an action by Francis McKeegan against Bernard O'Neill and Daniel J. Quigley, executors of John McKeegan, and against the legatees of John McKeegan, to recover the entire estate of John McKeegan, under an alleged contract contained in the following paper:

(1st page.)

Charleston 22 March 1876

Mr F. McKeegan

Dear Sir

this morning i .got a letter from Mr McNeill and one from you Relating to Cloney . . . . . . I have sent all the Power of aturney to Mr Nelson and title deed and mape of Cloney—yisterday according to Mr McNales Letter of requist—i have other Pappers Parteing to the same whish I will send if wanted   –   –   – May . Prise for Clony is 1400 haundred Pounes Cash And to anney one else £1500 haundred Poun Starling——Mr R. Nelson takes charge of the sale the same As if i ware there what ever he dos in the selling of Cloney is · Binding and right   —   —   ——

(2d page.)

Why did you not say what Cloney was worth in your letter as i wanted you to dow — — — May Prise to you is all ready sade on the other side £1400 haundre Pounes Starling Cash—to anney one else it will bee £1500 haundre Pounes but you get all i am worth at my death Plese let Nothing happen the Propperty until it is sold   —   —   —   —

I am sorrey to heare that may frend Mr R. Nelson is sick at Present but i hope he will bee well soon

JOHN McKEEGAN.

To the statement of facts made in the opinion it will be proper to add the following: John McKeegan purchased Cloney, a farm of twenty-eight acres, two roods, situated in the parish of Layd, barony of Glenarm, county of Antrim, in Ireland, for £1020, in the year 1839.   John put his brother Francis (father of plaintiff) in possession, who paid no rent, but was allowed to use and occupy it as an acknowledgment of the care and attention paid his mother.    There was an understanding that Francis was to pay the taxes and rates on the land, and also in later years to pay James (an older brother) £10 per annum.   About 1860 plaintiff moved with his wife into a house on Cloney, and thereafter helped his father to pay the charges on the land.   Francis died November 8, 1875, and two days thereafter the correspondence between plaintiff and John McKeegan commenced, the substance of which is stated in the opinion.

The chief witness for plaintiff was his attorney, W. W. McNeill, of Larne, County Antrim, who was examined by commission.    Upon the subject of the value of Cloney, he testified that it was worth to John McKeegan only £900, and thus explains how it was that Frank was induced to pay £1,400:

I say, on more than one occasion, on my being consulted by the plaintiff with regard to his purchasing said farm, I most distinctly informed him that the farm offered to be sold was not value for the purchase money required, as I considered such an exorbitant price, basing my estimate of the value not only on the nature of the lands themselves, and on their locality with which I was well acquainted (there being no railway within many miles of them or market town of any importance—Cushendall, the nearest town, being merely a village), but also on the government or poor law valuation, and which only estimated the entire lands and premises at the yearly value of forty-two pounds ten shillings, and also on the fact that the plaintiff, as the tenant in occupation, could not have been evicted by the said John McKeegan, as the landlord or owner, without first paying to the plaintiff as the tenant in occupation, at his election, a considerable sum, either for tenant right or for improvements and disturbance under the landlord and tenant (Ireland) act 1870 ; when the plaintiff met my objections by replying that his paying the £1,400 as the purchase money would be to all intents and purposes merely a temporary payment by him, as his uncle, the said John McKeegan, had given him to understand and believe, that

the said John McKeegan by his will either had or would bequeath him, the said plaintiff, all his property ; and I therefore most distinctly say that from my consultations with the plaintiff prior to the purchase it was only on the grounds and belief of his uncle carrying out such promise that the purchase was completed.

As to how those tenant's rights in Ireland affected the value of Cloney, Mr. McNeill explains:

I say the landlord or owner of the farm would not have obtained the full value upon a sale in open market with a tenant in possession; and I say that to enable him to obtain the full value of the farm he would have had first to evict the tenant in occupation by ejectment proceedings.   And I further say that immediately upon the service of such ejectment by the landlord or owner, such tenant in occupation, under the landlord and tenant (Ireland) act 1870, could have served upon the landlord or owner a notice of claim either for tenant right, under section 1 of said act, or for compensation for disturbance and improvements, under sections 3 and 4 of said act, with power to proceed either under section 1 separately or under sections 3 and 4 conjointly, and thereupon obtain from the landlord or owner, or person so evicting him, compensation as before mentioned, and in the manner he should elect.

After a very full statement of the pleadings and evidence, the Circuit decree proceeded as follows:

The preponderance of the evidence satisfies me that the estate was worth, over and above the tenant's claims insisted upon, more than the £1,400 paid, and that plaintiff so regarded it. In addition to what has already been referred to as evidence of the value of the place, it is in evidence that Mr. Hugh Bailey, an extensive farmer and an expert in such matters, lent the plaintiff £1,400 on the place, to pay the purchase money.   Under the law, if there were any such rights of tenants as claimed, they existed in favor of the estate of Frank McKeegan, the elder, and not in favor of the plaintiff, since the plaintiff was put in possession by his father, and never held under John McKeegan, or by his consent.   His occupancy from November, 1875, to March, 1876, was not a tenancy.   The loan of the purchase money by Mr. Bailey, on the security of Cloney, was therefore subordinate to the claims of the tenant, if the estate was so encumbered.   This is manifest from the letter of plaintiff to his

uncle, of 24th January, 1877, after the purchase, where he says: "My mother instructed John Rhea, of Belfast, solicitor, to institute proceedings against me to have a write marked out of one of the Superior Courts, if I do not give a sufficient offer of money to satisfy her through him."

But that letter, it may be remarked, before leaving it, shows more than this. It shows that Frank McKeegan, when he bought, got the place, or at least considered that he got it, free from any charges or encumbrances of this nature, as will be seen from the following extract. He says: "Now the way that Mr. Nelson arranged that matter was, that I purchased your whole interest in the town land of Cloney, and that I stood in the same position as you did, for £1,400, so that *as no one could have any claim against it on account of any existing tenant right now of force in Ireland*, and you will please let me know if you sold it to me with any claim against it." It appears to me that this destroys the whole fabric of that portion of plaintiff's cause which rests upon the insufficiency of Cloney as a consideration for the payment of £1,400, by reason of the encumbrance of tenant rights thereon.

If such rights did exist, they have no doubt been covered by the warranty covenants of the deed of John McKeegan, conveying the estate. If there were no such covenants, plaintiff could have shown it by the production of the deed. But the circumstances negative the idea that there were any such encumbrances on the place. This family had not occupied the property as tenants in the sense of the act of parliament referred to. They held gratuitously. The assessed value of the rent was, before 1839, £30, and now £42.10. The taxes were £5, and the rates 42s., and there was paid to James McKeegan £10 per annum by the occupants of the place, but there was no payment after he died, which was some time before the death of Francis McKeegan, Sen., except the rates and taxes. This shows that the occupancy was a gratuity of considerable value, given for many years to this family. If they had set up a claim for tenants' rights, &c., they would have been charged for the use and occupation, the rental value less the rates and taxes and payment to James

McKeegan, and would have been left largely in debt to the land-lord.[1]

But upon the theory set up by the plaintiff, that his father was a tenant, and he also a tenant, they both would be shown to have no claim to compensation under the act, because, upon this hypothesis, the father, who it is said was the original tenant, sublet to plaintiff, on his marriage, and divided the holding "without" (so far as appears in the testimony) "the consent of the landlord in writing," which, by the provisions of section 3 of the act, deprives both tenant and sub-tenant of all compensation under this section or section four.

Mr. McNeill, therefore, is mistaken in supposing that the circumstances attending the occupancy of Cloney by Frank McKeegan and family were such as to entitle any of them to tenant rights in the same, and hence his estimate of the value of Cloney, as being depreciated by reason of the existence of such rights, is not entitled to be considered. He must have been misinformed as to the nature of the occupancy. I think it is manifest that he first suggested this claim of tenant rights to plaintiff, as nothing was heard of them until plaintiff had consulted him. In the instructions forwarded by him to plaintiff to be sent to John Mc-Keegan, he proposes, if terms are agreed upon, "an agreement drawn in accordance with the late landlord and tenant Ireland act, 1870."

Efforts were also made to induce John McKeegan to institute proceedings to eject plaintiff's mother, or at least to write her a notice to quit. John McKeegan seems to have done neither. Perhaps, if he had, it might have been construed as a recognition of such a tenancy as would have entitled these parties to their tenant rights. All this may have been done in good faith, but if so, it must have been because plaintiff and McNeill, his attorney, were misinformed or misunderstood the condition of things. It is certain that nothing is heard of such claim in the case, except from plaintiff and McNeill. Mr. McNeill seems to have assumed

---

[1] In the Supreme Court, plaintiff contended that his honor had overlooked the first section of this act, which legalized "the usages prevalent in the province of Ulster," to which section Mr. McNeill testified this property was subject.—REPORTER.

the existence of such a tenancy from evidence which is wholly inadmissible. He says it was from the representations of Mr. Nelson and others. These declarations are certainly not evidence to establish such tenancy.

Plaintiff himself says his father did not consider himself a tenant; he is "sure of that." Plaintiff did not consider himself a tenant, he says, "because he paid no rent." This would make them "tenants at will," for a person who holds rent free, by permission of the owner, "is a tenant at will." *Taylor, Land. & Ten.*, § 60. *Tenants at will* are not tenants of a holding, within the meaning of the act. 33, 34 *Vic. Ch.*, 46, § 70. Very strong evidence that there were no such encumbrances on the property is to be found in the fact that they have never been enforced or insisted upon. If they had been, there would have been proof of it in this case.

It seems unnecessary to pursue this point further, nor do I consider it necessary to discuss the bearing of the testimony derived from the various wills made by the testator. I cannot see anything in them to aid me in determining whether those words, relied on by the plaintiff as having a contractual efficacy, entitling him to the relief he claims, are to be so construed or not. I conclude that the expression on the part of testator, in his letter to plaintiff, of March 22; 1876, in relation to the sale of Cloney, that "you get all I am worth at my death," is *not* such an expression of intention as amounts to a contract. It was not made by testator in order to accomplish the sale of Cloney, nor was the purchase of Cloney induced by the representation. Therefore there was no contract—either legal or equitable—created by the representation.

I need not follow the learned counsel in this case through their exhaustive array of authorities upon this subject. The principles, I think, are most satisfactorily stated by Mr. Pomeroy (3 *Eq. Jur.*, 1244, and notes), and in a paper in the *Central Law Journal* (vol. 15, p. 445). Mr. Pomeroy, in the section referred to, mentions two classes of contracts. First, all ordinary contracts which consist of an intentional offer on one side, and an intentional acceptance on the other, resulting in the meeting of minds upon the same terms. And adds: "There is, however, a

form of contract peculiar to equity, which is created by representations made by one party, and acts done by the other upon the faith of such representations. When an absolute unconditional representation of something to be done in the future, is made by one person in order to accomplish a particular purpose, and the person to whom it is made relying upon it, does the acts by which the intended result is obtained and purpose accomplished, a contract is thereby concluded between the parties."

In regard to the first class of contracts, Mr. Waterman, in his work on the performance of contracts, in a passage cited for the plaintiff, laid down the rule in regard to contracts to make a will thus: "A person may make a valid agreement binding himself to dispose of his property in a particular way, by last will and testament, and a Court of Equity will enforce such an agreement, by compelling the heirs at law to convey the property in accordance with the terms of the contract; but such a contract, especially when it is attempted to be established by parol, is regarded with suspicion, and not sustained, except upon the strongest evidence that it was founded upon a valuable consideration, and deliberately entered into by the decedent." According to this authority the relief, when the alleged promise is to make a will, is confined to the first class of contracts: legal contracts—where the minds of the contracting parties meet upon the same terms: "where there is an *intentional offer* on one side, and an *intentional acceptance* on the other"—deliberately entered into by the decedent.

There is, however, another class of contracts involving promises to make provision by will, which are doubtless enforced in equity, where there was no intention on the part of the decedent to bind himself, but where he makes a declaration of intention, "in order to accomplish a particular purpose, and secure what he desired by means of such representation." "A will is the free, voluntary, uninfluenced expression of a testator as to the disposition of his property." To say that a person is bound to make a will in a particular way, is to assert a contradictory proposition. A contract to make a particular sort of will, would appear, upon principle, to be a promise to do an act, in its nature revocable,

amounting to no more than a promise that the party should con
tinue of the same mind.

If one desired to make a contract whereby he would secure a
present benefit, to be paid for by a gift of his estate, to take
effect, like a will, after his death, it could be done by deed *inter
vivos*, even in regard to chattels, and without a conveyance to
trustees.  *Jaggers* v. *Estes*, 3 *Strob. Eq.*, 383.  At common law
that could not have been done in regard to chattels.  Where it can
be done, there is no necessity for the enforcement of agreements
to make a will.  Because if there really was an intention so to
contract, it could be done without any violation of the legal prin-
ciples applicable to wills.  A will is not only voluntary and revo-
cable, but it is an instrument of great solemnity, required to be
executed with extraordinary formalities.  It must be in writing by
the testator, in presence of three witnesses, who must subscribe the
same in his presence, and in the presence of each other, all of
which must be proven in the Court of Probate before the instru-
ment can take effect as a will.  It would be an extraordinary
exercise of power in a court to give effect to a representation by
words, or in a letter, of a purpose to make a will of a particular
sort, to the extent of conveying the entire estate of a decedent,
as if he voluntarily made such a will, thus dispensing with all
the statutory requirements in regard thereto.  Such contracts
have been enforced in some cases, but it is everywhere recog-
nized that the proof must be clear that the representations were
made and acted upon as an inducement.

There has been a great diversity of opinion and decisions in
cases of this character.  Most of those enforcing such contracts
have been where the consideration was marriage, or settlements
on marriage, or the making of mutual wills, and other acts per-
formed by the other party, irrevocable in their nature, and not
capable of compensation otherwise.  *Rivers* v. *Rivers*, 3 *DeSaus.*,
190, was a promise to make provision by will by a husband for
his wife in consideration of her release of all claim to his estate,
executed by her before marriage.  Chancellor DeSaussure said
he considered "that to make a will in a particular way, on proper
consideration, is as much the subject of contract as any other,
and he who makes a contract on the subject is as much bound

thereby as he would be by any other agreement on any other subject." He adds: "To be sure, the court would be more strict in examining into the nature and circumstances of such agreements than any other, and would require very satisfactory proof of the fairness and justice of the transaction."

In *Gary* v. *James*, 4 *DeSaus.*, 188, the daughter of testator, with her mother, had been driven away from his home by him. After many years, during which he lived with another woman as his wife, in order to induce his daughter to leave her mother and live with him, he wrote to her, promising if she would come, that she should be the object of his care, and should enjoy all the care and attention that could be bestowed upon her by a tender father, and adding, "you are the object of my love, *and shall be the heir of my property.*" The daughter came to live with the father for a time, and was finally driven off. He made a will in favor of the woman he lived with and died. The court enforced the contract, Judge James delivering the opinion of the court, saying: "Upon the whole of the reasons above stated, and under the particular circumstances of the case, I am of opinion that the contract entered into by the father with the daughter is binding upon his estate, and claims precedence of the will." The circumstances constituting the consideration for the contract are summed up in the following extract from the opinion: "On the part of the daughter the disadvantages were to quit a tender mother and subject herself, not to the reasonable will alone, but to the caprices of a father governed by a woman who had usurped her mother's place, and who, it might be expected, was naturally her enemy. Surely such sacrifices should have entitled her, as an only child, to look forward to the remuneration offered her by the letter, of being the heir of her father's property."

The following is not a case of a promise to make a will, but is instructive in this connection. In *Caborne* v. *Godfrey*, 3 *DeSaus.*, 514, the representation was made to a son by his father, who had heard of his intended marriage. He promised to give him, by deed, whether he married or not, eleven or twelve negroes, and half of his stock, and perhaps more. The son married in two months thereafter, and sued for the property in the father's lifetime. The father died without making any provision for the son.

Chancellor DeSaussure on Circuit said: "I admit that the promise must be positive in order to. be binding. On examining the letter carefully it does appear to me to contain a distinct and positive promise, etc.    *    *    *    I feel warranted, therefore, in saying that this was a solemn promise made by a father to a son to induce and promote his marriage." This construction was sustained by the Court of Appeals. It will be observed that this case is decided upon the · ground that there was a positive promise, upon the consideration of marriage, induced and promoted thereby, and made upon that promise.

In most of the other cases cited for the plaintiff, the principles laid down in these cases are maintained, and the contracts were formed upon similar considerations. The case under consideration is not founded upon an irrevocable consideration, as in the case of marriage or mutual wills, or the performance of personal services not capable of compensation otherwise. If Cloney had been purchased at a price beyond its value, and the circumstances were such as claimed for the plaintiff, he might have a recision of the contract and be fully restored to all he may have lost by the contract. He does not ask that. No necessity would exist for the enforcement of the extraordinary powers of the Court of Equity to make a will for John McKeegan, and to enforce it in favor of the plaintiff against his lawful devisees and legatees.

I do not understand that any of the cases, which I regard as authority, require that I should go so far, even had the case gone to the extent claimed by the plaintiff. But, as I have said, I do not find that the representation in this case was intended as a promise, or as an inducement to a contract, nor that it was acted on as such, and therefore it is not necessary to pursue this line of thought further.

I will only add that had this been such a representation as plaintiff would have it declared to be, acted upon by him, I would not have considered it a proper case for a decree for performance, for the reason that I regard Cloney as full value for the amount, and there would be no equity to support the demand of plaintiff for a conveyance, upon the same consideration, of the large estate of his uncle, already otherwise disposed of for laudable and beneficent purposes.

I conclude, therefore, that the evidence does not entitle the plaintiff to the relief demanded. It is therefore adjudged and decreed that the complaint be dismissed, and that the plaintiff do pay the costs of this action.

Plaintiff's exceptions to this decree are very lengthy, and consist of extracts from the decree, and then allege error therein. It is not necessary to a full understanding of the case that any of them should be inserted except the 17th, which was as follows:

17. Because his honor erred in that he held as follows: "To say that a person is bound to make a will in a particular way is to assert a contradictory proposition. A contract to make a particular sort of will would appear upon principle to be a promise to do an act in its nature revocable, amounting to no more than a promise that the party should continue of the same mind."

*Messrs. McCrady, Sons & Bacot*, for appellant.

*Messrs. DeSaussure & Son, B. H. Rutledge*, contra.

April 21, 1885. The opinion of the court was delivered by MR. CHIEF JUSTICE SIMPSON. John McKeegan, late of Charleston County, departed this life about August 10, 1881, at Charleston, unmarried and without children or lineal descendants. He died possessed of considerable estate, both real and personal, situate in Charleston and elsewhere in the state. He left a will, in which his said estate was disposed of as follows: a house and lot in the city of Charleston was devised to a former slave of his, Robert Morrison, a legacy of $1,000 was given to the "Sisters of our Lady of Mercy," in the city of Charleston, $500 to one Ella O'Neill, $500 to Bella O'Neill, $500 to Mary Janney, and $500 to the Very Reverend Daniel J. Quigley, and the remainder he devised and bequeathed to his executors upon certain trusts therein set forth, nominating Bernard O'Neill and the Very Reverend Daniel J. Quigley as his executors, both of whom qualified.

During the life of the testator he was seized and possessed of a

certain estate in the County of Antrim, Ireland, commonly known and called "Cloneymore." This estate it seems he owned as far back as 1839, which, under some arrangement, he permitted his brother, one Francis McKeegan, the father of the plaintiff, to occupy, and, as alleged in the complaint, free of rent or charge, except taxes, rates, and assessments, and also an annual allowance of £10 sterling to be paid to another brother, James McKeegan, the said Francis having occupied the same under said terms from 1839 to 1875, when he died.

Shortly after the death of the said Francis, the plaintiff opened a correspondence with his uncle, the said John McKeegan, as to this estate, which resulted in a purchase of Cloneymore by the plaintiff at £1,400 sterling cash, which was paid and titles executed in fee simple. The plaintiff alleges in his complaint that he was induced to make said purchase by a written agreement made by his uncle with him, that if he would purchase Cloneymore at the price of £1,400 sterling, at that time equivalent to $7,700, he, the said John McKeegan, would at his death give and leave him, the plaintiff, all he was worth; that is, all of the property, real and personal, of which he might die possessed; that, acting upon this promise and inducement, and at great inconvenience, sacrifice, and expense to himself, he did raise the said sum and paid the same to the agent of the said John McKeegan, from whom he received title deeds to Cloneymore, in fee simple.

John McKeegan having disposed of his entire estate, as hereinbefore stated, to other parties than the plaintiff, the action below was instituted, in which the plaintiff demands judgment that the executors of the said John McKeegan may be compelled to perform the agreement above, and to pay over, transfer, and deliver all of the property of their testator to him, the plaintiff, in pursuance thereof.

The case was heard by his honor, Judge Kershaw, upon testimony taken by the master and reported to the court, who in an elaborate decree dismissed the complaint with costs.

The exceptions to the decree by plaintiff, appellant, are numerous, but they may be disposed of, we think, in the discussion of the following grounds: 1. What is the law applicable to a case of

this kind, and did his honor lay it down correctly? 2. Did the testimony bring the case under this correct principle? And 3. Did his honor reach his conclusion as to the facts by the admission and influence of certain alleged incompetent testimony objected to by the plaintiff?

As to the first question, there is authority for the position that while a man may ordinarily by will dispose of his estate, either in whole or in part, at his pleasure, nay, even at his caprice, yet he may also bind himself to dispose of it in a certain way or to certain parties, and failing to do so, his agreement may be enforced against his legal representatives. This proposition is sustained by the following cases cited from our own reports: *Izard* v. *Middleton*, 1 *DeSaus.*, 116; *Grimke* v. *Ex'rs of Grimke*, *Ibid*, 366; *Rivers* v. *Ex'rs of Rivers*, 3 *Id.*, 190; *Gary* v. *Ex'rs of James*, 4 *Id.*, 185; *Caborne* v. *Godfrey*, 3 *Id.*, 514. Besides, it is supported by numerous English cases cited in appellant's argument.

It is true, however, in all the cases, in view of the fact that a will is the free, voluntary, and uninfluenced expression of a testator as to the disposition of his property, which in fact he may make or not as he chooses, and when made revocable if he desires; that for one to be bound to dispose of his property in a certain way by will, the agreement or contract requiring him to do so must be established by the most satisfactory proof and after the strictest and most thorough examination of all circumstances attending it; or, as was said by Chancellor DeSaussure in *Rivers* v. *Ex'rs of Rivers*, *supra*, "To be sure, the court would be more strict in examining into the nature and circumstances of such agreements than any others, and would require very satisfactory proof of the fairness and justness of the transaction."

The above proposition being conceded, we are led next to the inquiry: What is an agreement, and under what circumstances does it become binding on the parties? Agreements may be divided into two classes, distinguished by the mode in which they are made. 1. The ordinary agreement, where an intentional offer is made on the one side founded upon a sufficient consideration, and an intentional acceptance on the other, resulting in the meeting of minds upon the same terms. 2. "Where it is created

by·representations made by one party and acts done by the other upon the faith of such representations. When an absolute, unconditional representation of something to be done in the future is made by one person in order to accomplish a particular purpose, and the person to whom it is made, relying upon it, does the acts by which the intended result is obtained and purpose accomplished, a contract is thereby concluded between the parties." 3 *Pom. Eq. Jur.*, § 1244.

The first is a contract at law and the second a contract in equity, and a disposition of property by will may be made the subject matter of either as well as any other subject matter. The following proposition laid down in appellant's argument we think is a correct result from all the cases on this subject, *i. e.*: "That to make a will in a particular way, on proper consideration, is as much a subject of contract as any other, and he who makes a contract on this subject is as much bound thereby as he would be · by any other agreement on any other subject." It is said, however, by Mr. Waterman, which is in accordance with the caution already adverted to, that when the subject of the contract is the disposition of one's property by his will, "such a contract, especially when it is attempted to be established by parol, is regarded with suspicion and not sustained except upon the strongest evidence that it was founded upon a valuable consideration and deliberately entered into by the decedent." Now, no error can be attributed to his honor, the Circuit judge, on the ground that he failed to recognize the possible existence in law of these two classes of contracts. On the contrary, he recognized both, but he failed to find facts sufficient for the application of ·either, and it was upon this ground that he dismissed the complaint.

We do not think, therefore, that the decree of the judge, when read as a whole, is obnoxious to the seventeenth exception. Was his finding error? Generally, as we have had frequent occasion to say, in appeals in chancery cases, where the facts are found by the Circuit judge upon testimony, this court will not disturb such findings unless the manifest preponderance of the evidence is the other way. And if in this case the findings of fact below rested entirely upon evidence, the rule referred to would be applicable. But the plaintiff here claims under what he styles a written con-

tract, found in a certain letter of his uncle, the intent of which is a matter of construction; and construction of instruments being a matter of law, the question whether John McKeegan made the agreement relied on by the plaintiff is fully before us, at least so far as it depends upon the construction of the letter in question. The letter referred to is as follows:

"CHARLESTON, 22 March, 1876.

"*Mr. F. McKeegan.*

"DEAR SIR: This morning I got a letter from Mr. McNeill and one from you, relating to Cloney. I have sent all the power of an attorney to Mr. Nelson, and title deed and map of Cloney, yesterday, according to Mr. McNeill's letter of request. I have other papers pertaining to the same which I will send, if wanted. My price for Cloney is 1,400 pounds cash, and to any one else 1,500 pounds sterling. Mr. Nelson takes charge of the sale, the same as if I were there. Whatever he does in the selling of Cloney is binding and right. Why did you not say what Cloney was worth in your letter, as I wanted you to do? My price to you is already said on the other side, 1,400 pounds sterling cash, to any one else it will be 1,500 pounds, but you will get all I am worth at my death. Please let nothing happen the property until it is sold. JOHN McKEEGAN."

It is proper here to notice with somewhat more particularity than above the facts and circumstances surrounding John McKeegan when this letter was written. As we have already stated, Francis McKeegan, Sr., the father of the plaintiff, went into possession of Cloney in 1839, and remained in possession until 1875, when he died. The plaintiff during this time had grown up and married, and was living upon Cloney and cultivating a portion of it, paying part of the expenses attendant upon the possession. It was understood during all this time in the family of Francis, Sr., that at the death of John McKeegan Cloney would be theirs by will of the said John.

On the death of Francis, Sr., the plaintiff immediately wrote to his uncle John informing him of that event, and also that his elder brother, Alex., would have a place, and, stating his own embarrassed situation, asked as a great favor to him that he might rent one-half of Cloney and half of the house, proposing to

secure the rent, and saying that the other half would be sufficient for his mother and his brother John. This was November 8, 1875, two days after the death of his father. Receiving no answer, he then on December 30, 1875, addressed a letter to Mr. Bernard O'Neill, of Charleston, informing him that he had heard that his uncle intended to sell Cloney, and imploring him, Mr. O'Neill, to see his uncle and learn from him if he would not let his brother John and himself have the first offer, and to know his price. On February 19, 1876, having received a reply from Mr. O'Neill, he again wrote to him, thanking him for the information, "the manner and terms," and stating that he could raise the funds for the purchase, and further, that he would leave the value of the property to his uncle, and urging him to learn whether his uncle would accept his proposition. The letter above referred to, from Mr. O'Neill to which this was reply, the plaintiff failed to produce. No doubt, however, from the reply, that the "terms" were mentioned.

About this time the plaintiff received a letter from his uncle, but this letter he failed also to produce on the trial. To this letter he replied on March 2, 1876, acknowledging the receipt of his uncle's letter, and saying that he consulted Mr. Robert Nelson, to whom his uncle had referred him, about the present value of Cloney, and stating that if he (his uncle) intended to sell Cloney to him, he would leave the value to him, saying he could get two-thirds of the purchase money from the board of trade; and further, that he could get the other third in some way. He also enclosed a letter from an attorney, Mr. O'Neill, of Larne, conveying instructions as to drawing the papers necessary to the trade. On March 22, 1876, John McKeegan replied in the letter first above mentioned, which is the letter upon which the case turns. In the meantime and before the trade was concluded some correspondence took place between Mr. Nelson and Francis McKeegan as to the value of Cloney, but as the originals of these letters were not produced, and the copies were objected to, they will for the present be omitted.

Now, looking at this important letter from the standpoint of these surroundings, did his honor, Judge Kershaw, err in holding that there was no contract therein embracing the property now

claimed by the plaintiff? There was certainly no contract in express terms in the sense that a proposition was made and accepted for anything besides the estate of "Cloney." The negotiation up to this time between the parties referred to nothing else. The letters of Francis McKeegan indicated an earnest desire to obtain an interest in Cloney. At first he desired to rent one-half, but learning that it was the intention of his uncle to sell, he then became anxious to buy, and was willing for his uncle to fix the price, and distinctly made that proposition, first through Mr. Bernard O'Neill and then in a letter to Mr. John McKeegan himself. Nothing had been said about the·estate of John McKeegan in America. Nor does it appear anywhere that John McKeegan was at all anxious to sell Cloney to any one, nor that it would be a difficult matter to make a sale thereof. Nor does it appear in the letter that John McKeegan considered the value of any other property besides Cloney in fixing the price at which he was willing to trade. He thought "Cloney" was worth £1,500, but to his nephew he would let it go at £1,400, and it is manifest that there was no distinct, positive, and absolute contract made as to anything except Cloney, and that Francis McKeegan did not understand it to be a clear and distinct contract for more, is evidenced by the fact that he consulted his attorney, and afterwards, under the hope of fixing it, had the letter stamped, and this, too, without the knowledge of his uncle.

Was there a contract of the second class mentioned above? *i. e.*, "When absolute, unconditional representation of something to be done in the future is made by one person in order to accomplish a particular purpose, and the person to whom it is made, relying upon it, does the acts by which the intended result is attained and purpose accomplished, a contract is thereby concluded between the parties." To bring a case under this principle it must appear that the party sought to be bound desires to bring about a certain result, and that in order to accomplish his purpose he makes an absolute, unconditional representation that he will do something in the future, and that the party to whom it is made, relying upon it, does the act required. Or to make a specific application to the case at bar, it should appear that John McKeegan desired to sell Cloney to Francis McKeegan, and in

order to consummate the sale he made an absolute and unconditional representation to him that if he would purchase he would leave him all of his estate, and that relying on this representation Francis closed the trade and took Cloney.

Do these facts appear either in the letter or in the evidence, or in the two combined ? In the first place, it does not appear that John McKeegan was at all anxious to part with Cloney to any one, much less to Francis. The anxiety was all on the side of Francis. He wrote to his uncle within two days after the death of his father, and receiving no reply he then wrote to Bernard O'Neill imploring him to intercede in his behalf, proposing to buy upon terms to be fixed by his uncle, and then wrote a second letter to Bernard O'Neill, thanking him for information received as to the "manner and terms," stating that he could raise the necessary funds. These letters were all couched in the most earnest terms, and followed each other in quick succession.

John McKeegan finally replied to these earnest appeals, stating his price, and leaving it to Francis to say whether he would accept. It was in this letter, after stating to Francis that his price to him was £1,400, if to any one else £1,500, he added, "but you will get all I am worth at my death." Was this an unconditional statement that if Francis would take Cloney at the price mentioned, that in consideration thereof he would, in addition thereto, leave him all of his estate at his death ? Was it made to induce Francis to take Cloney, and did Francis act upon it with that understanding ? Would he have declined the purchase but for that representation ? We cannot think so; we cannot think that John McKeegan ever intended the statement in that sense, or that Francis ever so understood it, or so acted upon it.

There is no sufficient and satisfactory evidence in the case showing that "Cloney" was worth less than £1,400, even with the tenancy rights (whatever they might have been) upon the place. The plaintiff's testimony on that subject is very guarded. He says: "At that time the value of Cloneymore to me was not £1,400." The plaintiff makes no offer to rescind. There is no evidence that there was any pressure upon John McKeegan requiring him to sell, or that Francis was likely to be the only purchaser. In fact, Francis deprecated a public sale and urged

that this should not be had, and earnestly requested that he and his brother John should have the first offer.   The case is entirely destitute of any fact showing a reason or motive why John Mc-Keegan should .hold out such an unusual and extraordinary inducement for such a trade.   The only fact indicating that Francis ever conceived the idea that the whole estate of his uncle was embraced is the fact that he consulted his attorney and had the letter stamped.   Why did he not consult Mr. John McKeegan? If in his opinion the promise was so vague and doubtful as to require the opinion of an attorney, why, before acting, did he not have a distinct understanding with his uncle? and why, without any information to him at the time, or ever afterward during his life, did he have the letter impressed with sixpenny stamps?

The natural explanation of the remark in the letter, "But you will get all I am worth at my death," seems to us to be as follows: John McKeegan had acquired a considerable estate in this country; he was an old man, without wife or children.   His relatives lived in Ireland; he had been kind to them, especially to the family of his brother Francis; and it was the understanding, no doubt, with the knowledge of John, that at his death his kindness during life would be followed up by leaving to his family his estate here.   No doubt he intended to do this, and when he wrote this letter this intention was present to his mind—not as a part of the proposed sale of Cloney, but as a long existing intention, altogether disconnected from Cloney, and this remark was thrown in, not as an inducement for Francis to buy, but as a reason why he was willing to take from him £100 less than from any one else.   "I think the place," said he, "is worth £1,500, and if I was dealing with strangers, I should demand that sum, but you are to get my estate at my death anyway, and I will let you have Cloney at an under value."   This is far more reasonable than that he was selling not only Cloney, but his whole estate, for £1,400, Cloney to be delivered at once and the estate at his death.   At all events, the proof of the contract fails entirely to come up to the requirement of the cases cited.

It is urged, however, that there are numerous cases where the language used in a letter was not stronger than that used here, and yet the court held that a contract was established.   And the

following cases are referred to: *Gary et ux.* v. *Executors of James,* 4 *DeSaus.,* 185; *Caborne* v. *Godfrey,* 3 *Id.,* 514; *Goilmere* v. *Battison,* 1 *Vern.,* 48; *Wankford* v. *Fotherley,* 2 *Id.,* 322; *Hammersly* v. *Baron de Biel,* 12 *Clk & Fin.,* 45; *Bold* v. *Hutchinson,* 5 *DeG., M. & G.,* 558; *Ridley* v. *Ridley,* 34 *Beav.,* 478; *Coverdale* v. *Eastwood,* 5 *Eng. Rep.* (*Moak*), 755; *Sutton* v. *Hayden,* 62 *Mo.,* 101. We have examined each of these cases and find the proposition stated by appellant fully sustained. The language used in each of them is very similar to that employed in the letter of McKeegan. For instance, in the last case referred to it was: "All her property should at her death be her niece's."

There is a marked difference, however, between the case at bar and all of these, a difference which vindicates the judgment in the latter cases, and yet prevents the application to the former of the principle upon which said judgments were founded. In many of the cases cited, the act done by the promisee was founded primarily and entirely upon the promise made. It had no other consideration. To illustrate: In *Sutton* v. *Hayden, supra,* an aunt had written to the guardian of her niece promising that if she would come and live with her and nurse and take care of her for the remainder of her days, all her property should at her death be her niece's. The guardian assented to the arrangement, and the ward faithfully carried it out. So in the case of *Gary et ux.* v. *Executors of James,* 4 *DeSaus., supra.* "The father, who had separated from his wife, wrote to his daughter: If you will come and live with me, you shall be the object of my care, and shall enjoy all the attention that can be bestowed by a tender father. You are the object of my love and shall be the heir of my property." In both of these cases the contract was undoubted, and it was properly enforced.

In the other cases the promise was equally apparent, not, however, from the terms used simply, but because founded upon circumstances in the nature of marriage settlements, as in the case of *Coverdale* v. *Eastwood,* 5 *Eng. Rep., supra,* and *Caborne* v. *Godfrey,* 3 *DeSaus., supra.* In the former case, in contemplation of a marriage between a Mr. John Coverdale and a daughter of Eastwood, the mother of Coverdale wrote to Mr. Eastwood,

stating that her son was willing to settle £4,000 on Miss East-wood, and inquiring whether he would make a corresponding settlement. To this Mr. Eastwood replied that his business was not in condition to extract £4,000 from it, but that he had some years before made a will, in which he had left his property to trustees for the use of his daughter, and in the event of the marriage taking place, it was his intention to make a will in accordance with the facts of the case, and of course he would settle his property on his daughter in strict settlement, &c., &c. "I will take care that my property, which I suspect will exceed £4,000, shall be properly secured upon her and her children after my death." Held, that the above expression of intention amounted to a contract to settle the whole property upon the daughter in strict settlement. In the cases found in 1 and 2 *Vern.*, and 5 *DeG.*, *M. & C.*, *supra;* the promise was distinct and positive, and based on an event which was to happen, marriage or otherwise.

The case before the court is destitute of any fact of the kind mentioned in either of the classes of cases above. "Cloney" was the matter about which negotiations between the parties had been going on; nothing else was ever mentioned in any letter of the plaintiff, either to John McKeegan or to any one else. "Cloney" was the primary and, as it appears to the court, the only consideration for the payment of the £1,400. The remark of John McKeegan that the plaintiff "would get all of his property at his death," was not put upon the event of the purchase of Cloney, or as dependent in any way upon the negotiation in reference to "Cloney," but was a mere statement of what he, John McKeegan, had intended to do long since, voluntarily, and without regard to any consideration moving him thereto.

And it does not appear to the court that the value of Cloney is at all involved, or whether it was encumbered with tenancy rights, thereby reducing its present value to a purchaser. The plaintiff distinctly proposed, as we have already said, to purchase at a valuation to be fixed by the vendor, and this before the letter in question. That valuation was fixed and accepted, and the trade was consummated by the payment of the purchase money and the execution of titles, and in pursuance thereof the plaintiff has

been in possession for the last eight or ten years, without one word or whisper having ever been heard from the plaintiff that he had titles also to the estate of his uncle until the death of his uncle, when for the first time the claim is made upon his executors.

It perhaps would have been more in accordance with the promptings of nature that this old man should have left his estate to his relatives, but this estate was the fruit of his own labor and toil. He had earned and made it, and it belonged to him, and under our law, which is one of its boasts, he had the right to dispose of it as to him seemed best; and this, too, whether the disposition was moved by a sufficient and commendable motive, or by caprice: and having done so, although it has defeated the reasonable and natural expectation and hope of the plaintiff, there being no allegation or proof of undue influence, deception, or fraud, it must stand.

From the view which we have taken of the facts of this case, independent of the alleged incompetent testimony, we do not deem it necessary to determine whether the exceptions of the plaintiff in that respect are well founded. Because, even admitting the incompetency of this testimony, we think the decree of his honor is abundantly sustained by that portion about which there is no dispute. Nor is it necessary to say more than we have said above in reference to the encumbrance upon "Cloney" of the tenancy rights referred to in the argument.

It is the judgment of this court that the judgment of the Circuit Court be affirmed.