## 8681

### McAULAY v. McAULAY.

1. CONTRACTS OF MARRIAGE—STATUTE OF FRAUDS.—A parol contract of marriage including an agreement on part of the groom to make a settlement of property on the bride is within the statute of frauds, and the wife cannot enforce it against the estate of the husband, although his devisee and grantee was present at the making of the contract and assented thereto.

   MR. JUSTICE FRASER, *with whom the* CHIEF JUSTICE *concurs in the result, is of opinion that marriage is complete performance on part of the wife, taking the case out of the statute, and that the will and deed of the husband after the contract was made, making his daughter by a former marriage his grantee and legatee, is a fraud on the rights of the wife and should be set aside.*

2. TRANSACTIONS WITH DECEDENT—EVIDENCE.—The wife, the husband being dead, cannot prove by parol a contract of marriage, in an action to enforce the contract against his estate to set aside a deed and will made in violation of the contract.

3. SUPREME COURT—JURISDICTION.—Three Justices of this Court make a quorum for the transaction of business, and when the Court is composed of four members and they equally divide, the judgment below is properly affirmed.

Before MEMMINGER, J., Abbeville, March, 1913.   Affirmed.

Action by Ressa G. McAulay against Minna M. McAulay, in her own right and as executrix.   Plaintiff appeals.

*Mr. Wm. N. Graydon,* for appellant, cites: *Case not within statute of frauds:* 3 Dess. Eq. 514; 57 S. C. 576; 36 S. E. 780. *Defendant is estopped from setting up the defenses interposed:* 9 A. & E. Ann. Cas. 953; 21 S. E. 755; 48 S. C. 267; 50 S. C. 459; 57 S. C. 125; 100 U. S. 578; 16 Cyc. 722.

*Messrs. Greene & Hill,* contra, cite: *Promise to provide was not a consideration of the marriage:* 22 S. C. 473; 25 At. 877; 22 S. W. 557. *Previous offer of marriage having been refused, plaintiff must rely on what occurred just before:* 7 Ency. 128; 6 E. R. C. 139; 23 Pac. 220, 754; 12 Am. D. 287. *Contract is within the statute of frauds:* Riley's Eq. 230; 71 N. E. 842; 64 S. C. 428; 112 N. W. 92; 125 N. W. 937. *Marriage is not such performance as takes case out of statute:* 64 N. E. 159; 47 At. 39; 27 At. 812; 70 S. E. 588; 74 S. C. 46.

The opinion on the main case was filed on September 5, 1913, and that on the petition for rehearing on

October 29, 1913.   The opinion of the Court was delivered by

MR. JUSTICE FRASER.   This is an action to set aside a deed and will for fraud and to establish a contract.   The following statement appears in the Circuit decree:

"From the pleadings and testimony herein it appears that Mr. McAuley, an aged widower of Due West, South Carolina, with one daughter and considerable property which had come to him from her mother, his deceased wife, became enamoured of a Virginia widow, relict of a deceased minister of the gospel. The Virginia widow had also some property of her own and a small pension from the church. They entered into a long correspondence, much of which is evidence. A visit by Mr. McAulay and his daughter to the

widow's home in Virginia, object matrimony, was the result. The widow declined marriage unless provided for out of the McAulay property. She testifies to an oral agreement that that would be done with Mr. McAuley, which the daughter agreed to.

"They were married and returned to Due West. In less than two months Mr. McAuley died. On the very day of the marriage he had executed and delivered to the daughter, and she had forwarded for record at Abbeville, a conveyance of his real estate to her; and the same was duly recorded. The deed conveyed the property to the daughter for an expressed consideration of ten dollars and for love and affection, and the heirs of her body forever, but reserving the right to the grantor a life estate."

Within a few days after their return to Due West, Mr. McAulay, without the knowledge of his wife, made a will devising all of his other property to the daughter and her bodily heirs. "And should she die without heirs of her body, and my wife still survives, I desire it to go to her, Ressa G. McAulay, if she still remains single, and at her death or marriage, I desire it to revert to my kindred brothers and sisters, unless my daughter should will it otherwise." The daughter was made executrix of this will, and the same has been duly probated and she has qualified thereon; practically, therefore, the Virginia widow got nothing by the deed or will.

The deceased wrote a letter to the plaintiff before marriage, stating that he had property, but he had hoped to conceal that fact until after marriage in order to reserve it as a pleasant surprise. He told her, however, that he did not want her to consider the property an inducement, as he wanted the marriage to be purely a "love scrape." The mention of a sordid consideration even by the very young and romantic suitor could not be considered by a Court as entirely disingenuous—neither of these parties was young

or romantic. As soon as the marriage was arranged, the deceased and the defendant left the house and the conveyance of the real estate was made immediately before the ceremony.

The plan to defeat the rights of the wife that are about to attach must be perfected at once and all that could be done to accomplish that purpose was done. The wife has no right in the personal property and that can wait. They do wait but not long. It is very clear that having held out the property as an inducement, the husband at once set out to defeat the main consideration for the marriage and the means used were the *deed* and the *will*. It needs no citation of authorities to show that two papers that are in fact parts of one transaction may be construed as one. The deed has been set aside as to dower. Its invalidity as to dower is conceded. The invalidity is too plain for argument. Why set aside the deed and not the will? The answer is the wife has a right to dower; incohate, but still a right and there is no right to the distributive share. The answer would be complete if the right had accrued, but it had not. At the moment the deed was executed there was no more right to dower than to the distributive share. It is not the engagement to be married but the marriage that gives rise to the right of dower. An engaged man may make a deed and the future wife has no claim of dower. But a deed made in contemplation of marriage and to defeat the future right of dower does not deprive the wife of dower, because it is a legal fraud. If this were a business contract and the obligor had already started a scheme to deprive the obligee of all benefits under the contract and afterwards had made other dispositions of his property, with the same purpose in view, the Courts would not hesitate to set aside every step in the accomplishment of the fraudulent scheme. It may be said that the analogy does not hold because the wife is not a

creditor.    In this State she is a creditor and her rights as a creditor are of the most sacred order.

*Brooks* v. *McMeekin*, 37 S. C., p. 303: "Now, under the decision of our Courts, marriage is decided to be a purchase for valuable consideration of any rights conferred by law upon the wife, although no expression of such results are mentioned when the contract of marriage is entered into by her.    In *Rivers* v. *Thayer,* 7 Rich. Eq. 144, Chancellor Dargan announced the proposition in these words: 'Marriage is a valuable consideration.    Some have considered it the highest known in law.    None would say it was a lower consideration than money.    There is nothing unreasonable in this.    The great value of the consideration consists in this; that the wife surrenders her person and her self-dominion to the husband, and enters into an indissoluble engagement with him foregoing all other prospects in life, and if the consideration for which she stipulates fails, she can not be restored to the *status in quo.*    She can have no remedy or relief.'    In speaking of the wife's right to require the personal estate of her husband to be applied to the liens under the statutes of our State fixing the order of application of such personal estates by the deceased husband's personal representative so as to let in her claim of dower, in the case of *Wilson* v. *McConnell,* 9 Rich. Eq. 513, the Court uses this language: 'But this claim is met by a corresponding equity on the part of the widow, who is entitled to the position of a purchaser for valuable consideration against all but existing liens;' liens existing before marriage."

*McCreery* v. *Davis,* 44 S. C., p. 226.

So, in *Brooks* v. *McMeekin,* 37 S. C. 303, this Court held: "We are, therefore, enabled to declare it to be the law, as derived from our own decisions, that in this Commonwealth marriage is a valuable consideration, paid by the wife for those rights and estates that by our law are accorded to the wife, *as a wife.*"

It is true this authority refers to dower, but the law is not an aggregation of unrelated fiats, but a science and its rules ought to be followed to their legitimate and just consequences. It is true that a man can dispose of his personal property by will and thereby defeat the third that would otherwise go to his wife. The question is, can a man go to the altar with a well-defined and half-executed plan to deprive his bride of every consideration for which she marries him and have the Courts sustain the plan? Whether the consideration be money or love, both must go when the plan is revealed. Unless the rights of innocent purchasers for value are impaired, it ought not to be sustained. It is also true that a man may sell his property and thereby defeat the claims of creditors, but if the Court finds that the sale was made for the purpose of hindering, delaying or defeating creditors, the sale is void as to all who participated in that purpose even though the purchaser paid full value.

*Lowry* v. *Pinson,* 2 Bailey 324: "A sale of lands, made for the purpose of defeating the recovery of damages for a breach of promise of marriage, is fraudulent and void, if the purchaser have notice of the fraudulent intent; although the agreement for the sale was made before suit brought for the breach of promise, and although the purchaser paid an adequate consideration, and went into immediate possession, and the whole of the purchase money was in fact applied to the payment of *bona fide* creditors of the vendor."

It is said in the *State* v. *Chemical Co.,* 71 S. C. 569, "The plan may make the parts unlawful."

It is urged that there is no justice in taking any of this property from the defendant because it was really hers and was the savings from the income from her mother's property. There is no satisfactory proof of this. The evidence makes the income so small that it is difficult to see how the deceased saved anything at all from the combined income of husband and wife, and leads to the conclusion that there

were other resources of which the defendant and her witness know nothing. A witness urged him to put the Due West property in his wife's name. "He replied that he didn't think a minister should put his property under his wife's petticoat." If it were his wife's there was no impropriety. Even if the property in the name of the deceased had been bought with the income derived from her mother's estate and her father did not inherit from his deceased wife the one-third now claimed by the plaintiff, yet, if, as the testimony shows (she did not contradict it), that the defendant represented to the plaintiff, before the marriage, that her father was worth ten thousand dollars, she can not now claim that the property is and was her own.

Bigelow on Fraud, vol. I, p. 482 : "Where a marriage has taken place, on the faith of representations made by a third person, in regard to the circumstances of one of the parties to the marriage; such third person must make good his representation."

It may be, as suggested in argument, that it was modesty that kept the defendant from the stand. If so, we respect it, but however great our respect for womanly modesty, it is not a substitute for evidence in the Courts. The Courts are bound by the evidence.

It is said the widow can not claim both dower and a distributive share. The statute says "accept" and not "claim." The widow has not accepted either and claims a distributive share.

The second exception must be sustained. The plaintiff's services must have been worth at least her lodging and food and were not a provision under the contract.

The exceptions that refer to the competency of evidence under section 438 of the Code, are overruled as in contravention of the statute.

Those that refer to the sufficiency of the contract are overruled.

The contract was too vague and indefinite, even if it could have been proved.

This Court can and does set aside the deed and will because they were parts of one scheme to defeat the rights of the plaintiff, and the case is remanded for partition.

MR. CHIEF JUSTICE GARY concurs in the result.

MR. JUSTICE WATTS, dissenting. I cannot concur in the opinion of Mr. Justice Fraser herein. Without the testimony of the appellant not even a semblance of contract is established in reference to a marriage contract between Ressa G. McAulay and Roderick Hugh McAulay and her testimony is inadmissible and in contravention of the statute, section 438 of the Code, to admit this evidence would annul and abrogate this important section. The letters introduced do not establish any binding contract and are vague and uncertain. They are just such letters as may be expected some persons to write when they expect to persuade some women to marry the writer. An examination of McAulay's letter to the plaintiff will show that there was an agreement to marry between the parties already before he made any statement of his intention to provide for her, and these statements of his intention to so provide were not made to secure a contract of marriage, for he says: "I wanted to take you by surprise in all of this, but the pressure was so great on you that I could not * * * let me know at once, so that I can make other arrangements if you decide not to stand to our promise and betrothal to each other."

A reading of the correspondence convinces me that McAulay already had her agreement to marry him and was only stating what his intentions were after the marriage contract was performed and statements made by him as to what he intended to do for his wife was made by him, not in order to induce her to contract marriage with him, for she had

already made the agreement, but was a mere expression of intention on his part to do what he would have done in the natural course of events. It is natural to suppose that the husband would do his duty and make reasonable provision for the support of the wife of his bosom after his decease, but if the woman has any doubt about it she should protect herself by a valid legal contract made before marriage, and if she gives herself in marriage without this, then she takes the consequences. A woman who marries without a marriage contract takes the risk of inheriting whatever her husband gives her. If he dies intestate she gets her share, whatever that may be. If he leaves a will she is bound by that, unless she elects to claim her dower rights and refuses to accept under the will. To hold otherwise would be to prevent a man who marries from disposing of his property as he sees fit. Whatever intention a person has at one time as to the disposition of his property he has the right to change that intention before he carries it out and disposes of it differently, as was said in *McKeegan* v. *O'Neill*, 22 S. C. 473. McKeegan, in writing to his nephew in regard to certain negotiations for the sale of certain land, states price, and says: "But you will get all I am worth at my death." The Court says in regard to the intention of McKeegan: "No doubt he intended to do this, and when he wrote this letter this intention was present in his mind—not as a part of the proposed sale of Cloney, but as a long existing intention, altogether disconnected from Cloney, and this remark was thrown in, not as an inducement for Francis to buy, but as a reason why he was willing to take from him 100 less than from any one else." Later the same case says: "The remark of John McKeegan that the plaintiff would get all of his property at his death was not put upon the event of the purchase of Cloney, or as dependent in any way upon the negotiations in reference to Cloney, but was a mere statement of what he, John McKeegan, had intended to do long since,

voluntarily and without regard to any consideration moving him thereto."

But take plaintiff's testimony (which I think inadmissible under sec. 438 of Code, 1912), she cannot rely on letter of July 31, 1911, as she says, when McAulay came to her house in 1911: "All matters relating to our marriage had been broken off, or I had refused his offer of marriage." The defendant introduced in evidence letters written by plaintiff to defendant, dated after July 29, 1911, and plaintiff announced in said letters that she did not intend to marry McAulay, and asked that the matter be dropped and the matter terminated, and by her testimony shows that in September, 1911, when another proposal was made, it was put on another and entirely different ground that each was to own his or her separate estate, and neither was to have any rights in the estate of the other. This proposition was not accepted. The plaintiff's claim must be based not on the letters, but what took place at her home on the night previous to the marriage, and the morning of the marriage, as the previous proposition made in the letters had been refused and could not be made the basis of the contract of marriage. "An offer that had been refused is no longer the basis of a contract between the original parties. No subsequent acceptance of it, unless the offer is renewed, will create any obligation." 7 Enc. of Law 128; *Hyde* v. *Wrench,* 3 Beav. 334, 6 E. R. C. 139; *Smith* v. *Taylor,* 23 Pac. 220.

All of the testimony of the plaintiff as to what took place between her and McAulay is incompetent to establish the contract of marriage between them under section 438 of Code, and in addition to this such a contract is not binding under the statute of frauds, unless it is in writing and signed by the party to be charged therewith, and there is no such contract here.

In the case of *Davidson* v. *Graves,* Riley's Equity 230, it is held: "In the second place, a parol promise in considera-

tion of marriage is void; bonds and deeds executed in conformity thereto, after marriage, are merely gratuitous and must, as voluntary securities and conveyances, be postponed to creditors. But a third objection is, to my mind, decisive of the whole case: all proof of a verbal promise before marriage, is inadmissible and cannot be heard. When the statute is pleaded or interposed, as an objection to hearing the proof, as in this case, it must first be decided on, and if the case made, or proposed to be proved is within the statute, the evidence is not heard."

The rule is the same whether the agreement be for the marriage of the contracting parties or that one of them shall marry some other person. "The original contract relied on was upon condition that the plaintiff in error would marry a certain man. That contract is claimed to have been changed by various conversations and dealings between the parties, but whatever the terms of the final agreement, they were the outgrowth of the original contract that the plaintiff should marry the man, Diamond. However varied in terms, the promises all grew out of the agreement. No written evidence was offered by the claimant in proof of that contract. * * * The alleged promise being oral, and given originality in consideration of marriage, was within the statute of frauds and no action could be maintained upon it." *Austin* v. *Kuehn,* 71 N. E. 842.

The appellant contends that by marrying McAulay she fully performed her part of the agreement and the contract of marriage consummated and the statute of frauds had no application. This contention cannot be sustained. Pomeroy on Contracts, under the head of "Specific Performance" (2 ed. 111) says: "When a verbal contract is made in relation to or upon the consideration of marriage, the marriage alone is not a part performance upon which to decree specific execution. This rule, which is firmly established, is based upon the express language of the statute. A promise made

in anticipation of marriage, followed by a marriage, is the exact case contemplated by the statute. It is plain that the marriage adds nothing to the very circumstances described by the statutory provision, which makes the writing essential. In fact, until a marriage takes place, there is no binding agreement independent of a statute. So that the marriage itself is a necessary part of every agreement made upon a consideration of it, which the legislature has said must be in writing." Beach, in his Modern Equity Jurisprudence (section 622), says: "It is well settled that marriage is not an act of part performance which will take a parol contract out of the statute, for the statute expressly provides that a contract in consideration of marriage shall not be binding unless it is in writing."

I think the decree of his Honor should be affirmed and construe it to mean that the appellant has no interest in the property, except by way of dower.

Judgment affirmed.

Mr. Justice Hydrick. Concurs in affirming the judgment below on the ground that the contract upon which the action was brought was within the statute of frauds. I do not think that plaintiff's testimony narrating the conversation which took place between her and the defendant in the presence of Mr. McAulay is obnoxious to section 438 of the Code of Procedure, as will appear by examination of the cases cited in the footnote to that section.

Mr. Chief Justice Gary. When this case was heard by the Supreme Court, it was composed of five members—Mr. Justice Woods being one of them—but the opinion was not filed until he had resigned, for the purpose of accepting the office of United States Circuit Judge.

The decision was rendered by an evenly divided Court.

The appellant's attorney, filed a petition for a rehearing on several grounds, the first of which is, that the Court was without power to render the decision, for the reason that it was then composed only of four members.

The following sections in the Constitution of 1895, together with the corresponding sections in the Constitution of 1868, are applicable to this question:

| CONSTITUTION OF 1895. | CONSTITUTION OF 1868. |
|---|---|
| Section 2, Article V: | Section 2, Article IV: |
| "The Supreme Court shall consist of a Chief Justice and four Associate Justices, any three of whom shall constitute a quorum for the transaction of business." * * * | "The Supreme Court shall consist of a Chief Justice and two Associate Justices, any two of whom shall constitute a quorum." * * * |
| Section 6, Article V: | Section 6, Article IV: |
| "No Judge shall preside at the trial of any cause in the event of which he may be interested, or when either of the parties shall be connected with him by affinity or consanguinity, within such degrees as may be prescribed by law, or in which he may have been counsel or have presided in any inferior Court. In case all or any of the Justices of the Supreme Court shall be thus disqualified, or be otherwise prevented from presiding in any cause or causes, the Court or | "No Judge shall preside on the trial of any cause, in the event of which he may be interested, or where either of the parties may be connected with him, by affinity or consanguinity, within such degrees as may be prescribed by law, or in which he may have been counsel, or have presided in any inferior Court, except by consent of all the parties. In case all or any of the Judges of the Supreme Court, shall be thus disqualified from presiding in any cause or causes, the Court, or |

the Justices thereof shall certify the same to the Governor of the State, and he shall immediately commission, specially, the requisite number of men learned in the law for the trial and determination thereof." * * *

Section 12, Article V:

"In all cases decided by the Supreme Court, the concurrence of three of the Justices shall be necessary for a reversal of the judgment below, subject to the provisions hereinafter prescribed." * * *

the Judges thereof, shall certify the same to the Governor of the State, and he shall immediately commission specially, the requisite number of men learned in the law, for the trial and determination thereof." * * *

Section 12, Article IV:

"In all cases decided by the Supreme Court, a concurrence of two of the Judges shall be necessary to a decision."

In construing the foregoing sections from the Constitution of 1868, in the case of *Williams* v. *Bennett*, 35 S. C. 150, the Court said:

"It is contended, however, that there cannot be a constitutional quorum, without there is in existence the full number of members, provided for by the Constitution. If this proposition be true, as applied to the Supreme Court, we see no reason why it should not be true of every other body, of which a number less than the whole is legally declared to be a quorum; and we think we may safely venture to say, that such a proposition as to any other body, has never been accepted, and never could be accepted as correct, without paralyzing, to some extent at least, the arm of at least two of the great departments of the government. Such a proposition rests upon a fundamental misconception of the term 'quorum,' and the purposes for which it is used. The very purpose in providing for the transaction of business of any given body or tribunal by a quorum, is to prevent the stoppage of the public business, when a portion of the whole

membership may from any cause, fail to attend at the time
appointed, and whether such failure results from death or
some temporary cause, cannot affect the question.   The mis-
chief intended to be provided against, is the failure of the
whole number to attend; and we do not see how it can possi-
bly make any difference, whether such failure results from
one cause or another."

Again, the Court said:

"The framers of the Constitution must be regarded as
having contemplated the contingency, that at some time all
of the members of the Supreme Court would not be in
attendance, and, therefore, to provide for such a contin-
gency, after declaring who should constitute the Supreme
Court, they immediately afterwards, and in the same sen-
tence, qualified this general declaration, by providing that
any two of the constituent members of the Court should con-
stitute a quorum, so that the Court might proceed with its
business, just as if the Court were full.   Any other view
would, it seems to us, completely nullify the provision for a
quorum.   There is nothing whatever in the Constitution
indicating an intention, that the provision for a quorum
should only apply, in case of a temporary absence of one of
the members of the Court; and, on the contrary, the lan-
guage used is equally applicable, where the failure of such
member to attend is occasioned by death, as where it results
from some temporary cause.   Such, as we have seen, is the
accepted view in relation to the highest judicial tribunal in
this country, where the language constituting it is practically
identical with that, which we are called upon to construe, and
such, so far as we are informed, is the universally accepted
view in relation to all bodies, where provision is made for a
quorum."

We desire to call special attention, to the further language
of the Court, in that case, that, "from the very words of this
section (section 6), it is very manifest that its purpose was,
*not to declare or provide anything in regard to the neces-*

*sary elements, constituting the Supreme Court."* (Italics added.) It will thus be seen, that section 6, art. V, of the present Constitution, was not intended to provide anything, with regard to the elements necessary to constitute the Supreme Court, for that had already been done in section 2; but its purpose was to prevent Judges, who are disqualified by reason of interest in the cause, or relationship to parties from presiding, and to provide the manner of filling their places, and the places of those who, for any other reason, may not be able to sit.

The case just mentioned is conclusive of the question under consideration, unless section 29, art. I, Constitution of 1895, requires us to adopt a different construction. That section is as follows: "The provisions of the Constitution shall be taken, deemed, and construed to be mandatory and prohibitory, and not merely directory, except where made directory or permissory by its own terms."

It is contended, that as the provisions of the Constitution must be deemed to be mandatory, the Supreme Court is without power to hear a cause or render a decision, when there is a vacancy caused by death, resignation or temporary disqualification, but that, before the Court can hear a cause or render a decision, it must certify the cause of disqualification to the Governor, and must postpone action until he has commissioned, specially, the requisite number of men, for the trial and determination of such causes.

Section 29, art. I, Constitution of 1895, however, must also be construed to be mandatory as to the provision in section 2, art. V, of the Constitution, that any three Justices of the Supreme Court, shall constitute a quorum for the transaction of business. It will thus be seen that section 29, art. I, of the Constitution, is not conclusive, of the question under consideration, and that we are, therefore, at liberty to resort to other canons of construction.

At the time the Constitution of 1895 was adopted section 6, art. IV, Constitution of 1868 (which is practically identi-

cal with section 6, art. V, Constitution of 1895), had already
been construed, by the Supreme Court in *Williams* v. *Benet,*
35 S. C. 150, and effect can be given to section 6, art. V,
Constitution of 1895, by adopting the construction therein
placed upon section 6, art. IV, Constitution of 1868.
Whereas, if we adopt the construction for which the appel-
lant's attorney contends, it would render null and void the
provision, that any three Justices of the Supreme Court,
shall constitute a quorum for the transaction of business.

There is another reason why the construction, for which
the appellant's attorney contends, should not prevail, to wit:
it would render section 6, art. V, of the Constitution, incon-
sistent with the provision in section 12, art. V, of the Consti-
tution, that "in all cases decided by the Supreme Court the
concurrence of three of the Justices shall be necessary for a
reversal of the judgment below. * * *" It will be observed
that the concurrence of three Justices, is only necessary for a
*reversal* of the judgment below.

The cases of *Florence* v. *Berry,* 62 S. C. 469, and *Hutch-
inson* v. *Turner,* 88 S. C. 318, show that it does not require
three Justices to affirm a judgment, yet if the views of the
appellant's attorney, should be accepted, it would be neces-
sary for three Justices to concur in affirming, as well as in
reversing, the judgment below.    It will thus be seen, that if
section 6, art. V, of the Constitution, should be given the
force and effect for which the appellant's attorney contends,
it would be inconsistent, not only with section 2, art. V, of
the Constitution, but also with section 12, art. V, of the
Constitution.

Such a construction would be violative of the rule
announced in *Beck* v. *Zorn,* 48 S. C. 149, that "when two
sections are inconsistent, effect will ordinarily be given to
that section, which is in harmony with other provisions,
rather than to that which is inconsistent, with more than one
provision of the Constitution."

The fact that section 6, of art. IV, Constitution of 1868, was incorporated in the Constitution of 1895, as section 6, art. V, after it had been construed in the manner hereinbefore stated, shows it was not intended that it should have the effect of rendering null and void section 2, which provides that three Justices, shall constitute a quorum for the transaction of business. The rule in such cases is thus stated in 8 Cyc. 739 : "It is an established rule of construction, that where a constitutional provision has received a judicial construction, and it is afterwards incorporated in a new or revised Constitution, it will be presumed to have been retained with a knowledge of that construction, and Courts will be bound to adhere to it."

The next ground for a rehearing is that a decision can not be rendered by an evenly divided Court.

It is only necessary to refer to the following language from the case of *Hutchinson* v. *Turner,* 88 S. C. 318, to show that this ground is without merit.

"When the Constitution was adopted, it was therein provided, that the Supreme Court should consist of an even number of Justices. And, as this was unusual, the framers deemed it advisable, in order to prevent confusion, to state the effect of a decision, when the Justices were evenly divided in opinion, viz. : that the judgment below, should be affirmed. This was merely the adoption of the rule which would have prevailed, even without that provision, especially when there was the further provision, that, in all cases decided by the Supreme Court, the concurrence of three Justices was necessary, for a reversal of the judgment below.

"If the Constitution had failed to provide, that a less number than the five Justices composing the Court should constitute a quorum for the transaction of business, then the appellant would have ground for contending that a decision could not be rendered, when the Justices are equally divided in opinion, as it could not be foretold, whether the fifth

Justice would concur with the two Justices in favor of a reversal, and thereby change the result.

"As any three Justices are sufficient to constitute a quorum for the transaction of the business, a decision may be rendered when the Court is composed of three members, two of whom favor affirming the judgment below, while the third is in favor of reversing it.

"The fact that a fourth Justice participates, does not change this result—the concurrence of three being necessary for a reversal."

As to the other grounds for rehearing, the Court is satisfied that no material question of law, or of fact, has either been overlooked or disregarded.

It is therefore ordered, that the petition be dismissed, and that the order heretofore granted staying the remittitur, be revoked.

MESSRS. JUSTICES HYDRICK *and* WATTS *concur.*

MR. JUSTICE FRASER: I concur in the result. I think the Constitution requires a temporary appointment to fill the place of a Justice who is disqualified in a particular case, but there is no provision for filling the place of a Justice whose place is vacant, except section 2 of article V, and that provides for filling his place for the unexpired term. That provision is as follows: "All vacancies in the Supreme Court or inferior tribunals shall be filled by elections as herein prescribed: *Provided,* If the unexpired term does not exceed one year, such vacancy may be filled by executive appointment." This vacancy exceeds one year. It is true that section 6 of article V provides: "In case all or any of the Justices of the Supreme Court shall be *thus disqualified* or be otherwise prevented from presiding in any cause or causes, the Court or the Justices thereof shall certify the same to the Governor of the State and he shall immediately

commission specially the requisite number of men learned in the law for the trial and determination thereof."

The words "otherwise prevented from presiding" are general enough to cover all cases, but the specific words that immediately preceed this general expression are disqualifications.

The rule is well stated in Sutherland on Statutory Construction, section 268, as follows: "When there are general words following particular and specific words, the former must be confined to things of the same kind."

It seems to me, therefore, that the general words refer to disqualifications.

This is not in conflict with the point decided in *Williams* v. *Benet,* 35 S. C. 153. That case, like this, was a case of a vacancy and it is authority on that point. It seems to me that the point in this case is the filling of a vacancy. I think that there is no authority to fill the place of Mr. Justice Woods (the unexpired term being more than one year), and unless the number of Justices should become less than a quorum, the remaining Justices can continue to transact the business of the Court. This construction gives effect to every word of the Constitution, and I think is in entire accord with well established rules of construction. But, as I understand the question before this Court, the exact question is: "Is it necessary to have the Governor fill the vacancy in order to authorize this Court to hear and determine a case?" On this question the Court is unanimous in saying "It is not necessary."