## 10677.

### WATSON *ET AL.* v. COX *ET AL.*

(108 S. E. 168)

1. DEEDS—DELIVERY NECESSARY.—Unless a grantor delivered the deeds that he had drawn up either to the grantees or in escrow, and unless he parted with them intending to part with control of them, the deeds were never fully executed, and the grantor did not divest himself of the fee in the land, but if he did deliver the deeds in this manner the fee passed immediately to the grantees named.

2. DEEDS—DELIVERY TO SCRIVENER HELD TO CONVEY TITLE.—When grantor delivered to the scrivener deeds in which his children were grantees, *held,* that there was valid delivery.

3. DOWER—NOT DEFEATED BY VOLUNTARY DEED MADE IN CONTEM-
PLATION OF MARRIAGE.—A voluntary deed made in contemplation of
marriage, and to defeat the future right of dower, does not prevent
the inchoate right of dower of a subsequent wife from attaching to
the land of which the husband was possessed at the time of his
marriage; she being, through no fault of hers, ignorant of such
transfer of title.

4. DOWER—ATTACHES UPON CONSUMMATION OF MARRIAGE.—Upon the
consummation of marriage the law causes the inchoate right of
dower to attach, whether there be a contract in writing or not,
and it is beyond the power of the husband to destroy this right
after marriage.

5. DOWER—DEEDS HELD EXECUTED TO DEFEAT DOWER.—Evidence *held*
to show that deeds involved were made in contemplation of marriage
and for the purpose of defeating dower.

6. TRIAL—FINDINGS AND CONCLUSIONS OF TRIAL COURT HELD NOT IN-
CONSISTENT.—Findings of trial Court that there was no testimony
to show that deeds in question were made with the intention of
defrauding defendant wife or that they were made in contemplation
of marriage *held* not inconsistent with a conclusion of the Court
that the deeds under the circumstances were fraud upon the marital
rights of such wife, and hence that they did not bar her inchoate
right of dower, and Appellate Court could sustain such conclusion,
although the wife did not appeal from the alleged inconsistent
findings of fact.

7. DEEDS—CLAUSE AS TO POSTPONEMENT OF POSSESSION HELD NOT TO
DESTROY. FORCE OF INSTRUMENT.—A clause, "Providing, neverthe-
less, that G. * * * and M. are not to have possession nor is the
deed to take effect until the youngest, M., shall become twenty-one
years of age," contained in a deed otherwise providing that they
were to have and hold all and singular the premises forever, *held*
not to destroy the force of the instrument, it being apparent that
grantor was anxious to safeguard the interest of the grantees during
their adolescence, the fee vesting immediately, and possession and
use being reserved to the grantor and his estate until M. should
attain her majority.

Before PFURIFOY, J., Greenville, December, 1919. Mod-
ified and affirmed.

Action by Dora Cox Watson et al. against Samuel M.
Cox et al. From decree the plaintiffs appeal from the
allowance of the dower claim of Mrs. Annie Cox. The

defendant, Samuel M. Cox, appeals from the finding that the delivery of the deeds by him to his children was irrevocable, and three grandchildren, Gilmer, Mary and Marion Thompson, plaintiffs and defendants, appeal from the finding that a deed to them was void.

*Messrs. Stephen Nettles* and *Wm. G. Sirrine,* for Samuel M. Cox and Mrs. Annie Cox. *Mr. Nettles* cites: *To sustain deeds it must affirmatively appear that intention was to irrevocably deliver them*: 18 C. J., 208; 8 R. C. L., 995; 104 N. E., (Ill.), 229; 38 L. R. A., (N. S.), 941; 125 N. W., 307; 148 N. W., 734; 58 N. E., 439; 64 S. W., 361; 76 N. E., 846. *Voluntary conveyance by widower to his children in contemplation, of matrimony is a fraud on the marital rights of the prospective wife*: 96 S. C., 86; 44 S. C., 195; 37 S. C., 285; 109 A. L. R., (Ill.), 316. *Deed to grandchildren is void because not intended to vest a present title in them*: 2 Strob. Eq., 343; 9 Rich. Eq., 111; 4 McC. L., 12; 24 S. C., 228; 15 S. C., 440; 8 R. C. L., Sec. 157. *Where grantee under deed, with knowledge of circumstances of execution, disclaims interest thereunder, he is bound by his admission*: 86 S. C., 358; 53 S. C., 24; 16 S. C., 132.

*Messrs. Cothran, Dean & Cothran,* for plaintiffs and the Thompson children, defendants, cite: *Delivery of deeds under conditions here, vested title in grantees subject to life estate of grantor*: 9 A & E Enc. L., 157; 13 Cyc., 569; 121 Am. St., 64; 128 N. W., 944; 133 N. W., 683; 113 N. W., 631; 153 N. W., 604; 71 Atl., 398; 98 Pac., 756; 33 Pac., 338; 10 R. C. L., 641; 57 So., 756; 61 So., 807; 137 Pac., 29; 4 L. R. A., (N. S.), 816; 100 N. E., 947; 115 N. E., 721; 119 N. E., 967; 93 N. E., 548; 92 N. W., 661; 114 N. W., 548; 9 L. R. A., (N. S.), 317; 105 Pac., 26; 38 L. R. A., 943; 147 Pac., 805; 123 N. W., 12; 144 N. W., 552; 158 N. W., 134; L. R. A., 1917C, 964; 66 So., 524; 139 S. W., 337; 146 N. W., 939; 144 N.

W., 553; 219 N. Y., 523; 202 N. Y., 115; 89 Pac., 690; 9 L. R. A., (N. S.), 318; 98 Pac., 756; 74 N. E., 776; 122 N. E., 497; 4 L. R. A., (N. S.), 817. *In equity case conclusions of fact must stand unless opposed to preponderance of testimony*: 108 S. C., 232; 105 S. C., 60; 105 S. C., 1; 92 S. C., 113. *Rights of wife as to dower claim in lands conveyed by husband before marriage, but in contemplation of it*: 96 S. C., 86; 9 R. C. L., 591. *Must be with purpose of unfairly depriving her of dower to be set aside*: 65 Am. St., 350; 24 Am. Rep., 740; 39 Am. Dec., 501; 8 L. R. A., 95; 1 Ann. Cas., 856; 66 Am. Dec., 534; 9 Am. Dec., 318; 41 L. R. A., 258; 51 L. R. A., 858; 39 Am. Dec., 218; 8 L. R. A., 814; 48 L. R. A., (N. S.), 512; 13 Ann. Cas., 104; 37 S. C., 285. *Under deed to Thompson children the title passed and proviso postponed the enjoyment*: 83 S. C., 329; 5 Rich. L., 189; 10 Rich. Eq., 217. *If proviso is inconsistent with estate granted it is void*: 48 S. C., 316; 2 Strob. Eq., 101; 6 Rich. 54; 1 Hill Ch., 265; 17 S. C., 536; 102 S. C., 248. *Deed was a covenant to stand seized*: 10 Rich., 66; 24 S. C., 228; 54 S. C., 353; 12 S. C., 564; 101 S. C., 350.

July 15, 1921.

The opinion of the Court was delivered by ACTING ASSOCIATE JUSTICE FRANK B. GARY.

This is an action in which the relief sought is the removal of a cloud on the alleged title of the plaintiffs to the land described; an adjudication that the plaintiffs own the fee in the lands; an injunction against S. C. Cox mortgaging or disposing of the said land; and a declaration that Mrs. Annie Cox has no claim of dower therein.

The case comes before this Court upon numerous exceptions to the decree of his Honor, the presiding Judge. Some of the exceptions are filed by the plaintiff and some by the defendant.

There are three main questions raised by the pleadings. These embrace several minor questions:

First.   Did S. M. Cox make a delivery of the deeds in question and thereby divest himself of the fee in the lands referred to?

Second.   Was the wife whom he married after he signed the deeds thereby prevented from acquiring an inchoate right of dower in said lands?

Third.   Does the deed in favor of the grantor's grandchildren, Gilmer, Marion and Mary Thompson, convey an estate to them?

Should the first question be answered in the negative, there would be no reason to consider the other questions. We will consider them in the order named.

In 1911 the defendant, Sam M. Cox, after having reared a large family, lost his wife.   His children were the plaintiffs except Royal Cox, Bessie May Shannon and Gillman Thompson, who are his grandchildren.   The defendants, Marion Thompson and Mary Thompson, are also his grandchildrn.   The parents of these grandchildren, who were children of S. M. Cox, are dead.   Mrs. Annie Cox is the second wife of Sam M. Cox.   She was married to him after the deeds were signed by S. M. Cox, but while he was in possession of the land and apparently the owner of it.

The complaint alleges that the deeds were executed on the 14th of March, 1914, in pursuance of a family settlement with the children and grandchildren of S. M. Cox. The answer put in issue this claim, asserting that the deeds were never delivered, though signed by S. M. Cox and turned over to L. E. Childress, his alleged agent.

There is no difference of opinion as to the principles of law that should affect the first question, to-wit, that unless the grantor delivered the deeds that had been drawn up by him either to the grantees or in escrow, unless he had parted with them intending to part

with control over them, the deeds were never fully exe-
cuted, and the grantor did not divest himself of the fee
in the lands; if he did deliver the deeds in this manner,
the fee passed immediately to the grantees named.

Our inquiry will therefore be directed to the question
of what conclusion of fact must be reached in the light
of the circumstances surrounding the transaction.

The testimony shows that Sam M. Cox was well ad-
vanced in years; in fact, had passed the allotted period.
He had been a widower for three years. His life was
comparatively lonely, although his children, who had mar-
ried, looked after him. He had accumulated about 350
acres of land, presumably with the assistance of his wife
and children. As is usually the case with men of his age
and in his situation, "his fancies lightly turned to thoughts
of love," or rather to thoughts of matrimony. His own
statement is that he always intended to marry again, but
had not selected his spouse to be. His children were nat-
urally solicitous about his intended marriage. They were
necessarily concerned, as all right-thinking children would
be, lest their father become, at his age, the victim of some
designing woman. This is not intended as a reflection on
the woman he did marry. For ought that the Court knows
she may be a good woman who makes the old man a du-
tiful wife. The children under the circumstances would
naturally be the beneficiaries of his property after his
death. He does not seem to have had any other idea
than that his children should inherit his property. They
would most naturally be concerned about anything tending
to dissipate the estate.

Whether what thereafter took place was due to this
natural and commendable solicitude of his children for
their father and the property in which they had a moral,
if not legal, interest, or whether it was due to their cold-
blooded and selfish insistence, the fact remains that he
voluntarily procured a survey to be made of his lands, a

division to be made according to where he thought the lines should run, and had the children pay for the surveys. He was apparently under no compulsion then. After he had procured plats to be made of the several tracts, he sought a lawyer and procured deeds to be made of the several tracts in favor of his children and grandchildren respectively. He does not seem to have been under any fear or compulsion at that time. None of the grantees were then present threatening or coercing him, even though they had previously manifested concern about his talk of marriage. After signing these deeds in the presence of witnesses he turned them over to the scrivener to be kept by him. There is a conflict here as to what the grantor's directions were. The scrivener who is disinterested says that he directed him to keep them until his death, and at the grantor's death deliver them to the respective grantees. Upon cross-examination he is uncertain whether he said, "Keep them until my death," etc., or, "Keep them for me and give them to my children," etc. He is uncertain as to the verbiage. The scrivener held the papers for several years. The old man married. Then it was that the confusion arose. He said he had not conveyed his property and took steps to undo what had been done and to undo what had been acquiesced in for several years.

If we might enter the realm of speculation, we would readily conclude that when this good woman found herself mated to an old man, presumed to be possessed of considerable property, but in reality without more than a life estate, she let her displeasure or disappointment at the situation be known to him in no uncertain terms. It should not be surprising that when so accosted, after long acquiescence in what had been done, he suddenly sought to undo it.

We need not speculate, however, when we conclude that Sam M. Cox did the things enumerated voluntarily, and not under compulsion. Besides, the evidence shows that he told Mat Cox, his brother, that he had divided his prop-

erty and deeded it to his children and left the deeds with Mr. Childress to be kept as long as he lived, and after his death to be delivered to his children. He said he did not want the children to see the deeds because some of them might be dissatisfied about what he had left them or given them. He said nothing at that time about wanting to recall the deeds.

To J. Frank Epps, a lawyer of high character, he said he had made deeds to his land to his children and delivered them to the children upon his death; that before his second marriage he had cut his property up, some to one child and some to another; that he thought he had the whole thing settled; but that circumstances had come up, his second marriage, the dissatisfaction of his wife, the anxiety of his children, etc., that caused trouble.

The anxiety of the children as elsewhere explained was due to the fact that the deeds were held by Childress and were not recorded. The dissatisfaction of his wife was, it seems, due to the fact that she had just learned that he had disposed of practically all of his property, except a life estate.

Mr. Epps further testified that—

"The impression left on my mind was that Sam Cox thought that he was in a mess and didn't know what to do. His children were after him and so was his wife."

There was friction between the children and the stepmother. It was under these circumstances that he sought to palliate a dissatisfied wife, by repudiating acts long acquiesced in, and, until his marriage, never questioned.

When Sam Cox had this land surveyed, divided, and platted, and procured the various deeds to be drawn up, and signed in the presence of witnesses, and then turned them over to Childress, he surely intended to do something effective. He either intended to fully execute deeds, or his conduct was idle. It makes but little difference whether he directed Childress to keep the deeds and deliver them

after his death, or to keep them for him and deliver them to his children, he must have intended that through this medium they should be transmitted to the various grantees.

We prefer and do conclude that he intended to do something effective rather than that his conduct was idle and amounted to nothing. We cannot accept his statement made in his present predicament that he intended to mislead his children and make them think he had done something for them when he had not. He says now:

"I don't doubt that the children thought that they [the deeds] were good. I just meant to hold them off so that they would let me alone and let me die in peace."

Such avowed duplicity does not commend itself to us, but tends rather to discredit other statements made by him. In view of his oft-repeated statements in different form and to different people that he had deeded his property to his children, and in the light of all the circumstances, we are of the opinion that, when the grantor delivered the deeds referred to to Childress he intended that it should be made certain that his children and grandchildren would get his land, that the dower right of any future wife would not complicate matters, and that he would reserve all he needed—a life estate. It was a complete execution of the deeds, and had the effect of divesting S. M. Cox of the fee in the land in question, but of reserving to him a life estate therein. At the same time there was in contemplation the barring of the dower right of any future wife. The decree of the Circuit Judge is therefore in this particular affirmed.

Was the wife whom S. M. Cox subsequently married thereby prevented from acquiring an inchoate right of dower in said lands? There is little or no question as to the law. The difficulty is to determine whether or not the circumstances will warrant the application of these well-known principles, to-wit, that a voluntary deed made in contemplation of marriage and to de-

feat the future right of dower does not prevent the inchoate right of dower of a subsequent wife from attaching to the land of which the husband was possessed at the time of the marriage, she being through no fault of hers ignorant of such transfer of title. Upon the consummation of marriage the law causes the inchoate right to attach whether there be a contract in writing or not; and it is beyond the power of the husband to destroy this right after marriage.

There is nothing in the case of *McAulay v. McAulay,* 96 S. C., 86; 79 S. E., 785, in conflict with this statement of the law. There the question under consideration was whether or not a deed made in derogation of a premarriage agreement not in writing would be set aside as in fraud of the wife's right to participate in the distribution of the husband's estate. It was conceded that the deed would be void; in so far as it purported to affect the wife's dower right to a distributive share in the land conveyed fraudulently a written contract would be essential; that a verbal contract could not be proved, because it would be within the statute of frauds. In the case before us the law makes the contract that casts upon the wife the inchoate right immediately upon the marriage. This right when it attaches cannot be defeated by the husband. In this respect the right differs from the right to participate in a distribution which can be preserved as against deeds by a written contract, but not otherwise.

We are not now confronted with the question of whether or not Mrs. Cox has a valid claim against the land as heir at law or distributee. Indeed such question would be premature now, nor could such claim be successfully made as against the deeds; there being no evidence of a written agreement. That was the question before the Court in *McAulay v. McAulay, supra.* This case holds that a voluntary deed made in contemplation of marriage would defeat a future wife's rights in the land conveyed, as heir at law or distributee, unless such rights were preserved by a

4—S.C. 117

written contract. That a verbal contract or agreement would be within the statute of frauds.

One of the reasons assigned for this holding is that one may do whatsoever he pleases with his property, and that even after marriage the husband might by a conveyance destroy the wife's right to a distributive share in the land conveyed. Such reasoning does not apply to the wife's right of dower. The law gives her the right of dower at her marriage, and places that right beyond the control of the husband.

For this reason and for the additional reason that the wife's dower right was not in question, but was conceded, we think that the case of *McAulay v. McAulay, supra,* is not in conflict with nor does it supercede the law as laid down in *Brooks v. McMeekin,* 37 S. C., 285; 15 S. E., 1019, which seems applicable to the case before us, in so far as Mrs. Cox's inchoate right of dower is concerned. That law is impressively expressed in the following statement:

"We are enabled, therefore to declare it to be the law, as derived from our own decisions, that in this commonwealth marriage is a valuable consideration paid by the wife for those rights and estates that by our law are accorded to the wife as a wife."

This was said with reference to dower.

We quote further:

"Here was a man of confessedly weak health. Is it to be a matter of censure that the woman he asked to be his wife and the mother of his children considered that he was the owner of a large plantation well stocked? This wife said she knew that her husband was the owner of this landed property, and that any change in the ownership was studiously withheld from her. So much so that she was not aware until a year or so after her husband's death that there was any claim that he was not the owner of these lands. Was she not deceived? Did not both Henry

and Stephen Gibson secretly confederate to destroy an estate that they both knew the law would give her at her marriage? Was this not a fraud? Marriage to a woman is a valuable consideration for the purchase of the privileges of wifehood, with all the rights affixed to that relation *by the law of the land* [Italics added]; and any secret combition to defeat the vesting of those rights, between the husband, the vendor, and his vendee, is an actual fraud."

Taking this to be the law, let us see what the circumstances will warrant us in holding as to the facts. Let us see if the deeds were made with a view to marriage and to defeat a future right of dower. It will be remembered that Sam Cox was a widower well advanced in years having a large family of children and some grandchildren. In the natural course of events the old man would not live long. .Apparently he was on good terms with his family. His children and grandchildren would naturally inherit his property. The old man was talking of marrying again. The children opposed it. They were concerned lest he marry and thus destroy their expected patrimony—patrimony that they had a moral right to expect. We think the testimony warrants us in saying that to avert such consequence they urged him to make such disposition of his property as would save their expected patrimony to them. He says he made the deeds in consequence of their insistence. Their insistence was on account of their fear that a future wife would acquire interests in the property. It did not amount to coercion. Mr. Childress testifies that—

"On several occasions he talked with me about his children being after him to deed them his property because they were afraid he would marry again."

Mr. Sam Cox testifies:

That the deeds were given to Childress in March, 1914. "At that time I intended to marry again, but had not decided whom I would marry. When I became engaged to my present wife I was living on the land involved in this

suit.   I don't think I told my wife about these deeds until some time after the marriage."

He says further in answer to the question:

"Q.   What did he [George] say to you, Mr. Cox?   A. He just simply said: 'Pa, there has been so much trouble and disturbance, you just simply make a deed and marry whom you please.'   Q.   What did you do then?   A.   I went and asked Childress to write me off some deeds."

He says further:

"I didn't want it done, but they kept arguing with me about marrying."

It seems that the conclusion is irresistible that the deeds were made with a view not only of dividing his land during his lifetime and reserving all he needed—a life estate— but of preventing the attaching of the right of dower of some future wife whoever she may be.   It makes no difference on whose initiative or suggestion this was done, if this was the purpose of the deeds, a future wife's right of dower would not be barred if the circumstances justified her belief that he still owned the land.   We have concluded that this was one of the purposes of the voluntary deeds.

In view, therefore, of the law and of what we find to be facts, we conclude that the deeds made at the time and in the manner detailed did not bar the inchoate right of dower of Mrs. Annie Cox, who was ignorant of the existence of the deeds and who married Mr. Cox having reason to believe that he was the owner of the land.   The decree of the Circuit Judge is affirmed in this particular.

Objection is made that Mrs. Cox has not appealed from certain alleged findings of fact by the Circuit Judge, which facts would absolutely prevent the conclusion reached by the Circuit Judge if unreversed by this Court.   Mrs. Cox does ask, however, that the conclusion be affirmed on certain additional grounds

to-wit, that the Circuit Judge should have found as facts the reverse of what he is alleged to have found.

It is always well to adhere to the rules promulgated for hearing appeals, and we would not encourage any laxity in this regard; nor would we sanction any serious departure from those rules, especially if the departure affected injuriously the opposing side.

The case before us presents a peculiar situation. The Circuit Judge's conclusion is favorable to Mrs. Cox. She therefore does not wish to reverse it. In arriving at his conclusion the Circuit Judge incidentally says that "there is no testimony to show that the deeds were made' with the intention of defrauding the defendant, or that they were made in contemplation of marriage," circumstances that are essential to preserve a future wife's marital rights in the property if it is conveyed. He goes on, however, and finds that the deeds under the circumstances were a fraud upon the marital rights of Mrs. Cox.

It seems to us that the Circuit Judge must be understood to have meant that the making of the deeds was not intended to affect the marital rights of this particular individual as contradistinguished from an intention to affect any person whom S. M. Cox should marry. Taking this view of his Honor's language, there is nothing inconsistent in his conclusion. In any event it would be taking too narrow a view of the Court's duties if we should decline to consider her contention because it might not be in exact accordance with the rule, when she is making an honest effort to have the Court pass upon it. Had it been necessary, we would have considered her "additional ground," under the circumstances ex gratia.

This brings us to the last question: Does the deed in favor of the grantee's children, Gilman, Marion, and Mary Thompson convey any estate to them? This deed was executed under the same circumstances and at the same time as were the other deeds re-

ferred to. It is regular in every respect except that the following words appear in the habendum clause:

"To have and to hold all and singular the premises before mentioned unto the said Gilman Thompson, Marion Thompson and Mary Thompson and their heirs and assigns forever. Providing, nevertheless, that Gillman T., Marion T., and Mary T. are not to have possession nor is the deed to take effect until the youngest, Mary, shall become twenty-one years of age."

The Circuit Judge holds that the last sentence is such an inconsistent provision as will destroy utterly the force of the instrument. We cannot take this view of it. These three grandchildren were as much the objects of the grantor's intended bounty as any of the children or other grandchildren. The circumstances under which he sought to deliver to these children their part of his estate are the same as those under which he gave to the others their part. The only difference was that he was anxious to safeguard the interest of the three grandchildren during their adolescence, and he attempted by this provision to do so. Surely the Court will not permit his well-meant, but misdirected, efforts along this line to destroy their inheritance unless the rules of construction imperatively demand it. The boast of equity jurisprudence would indeed be empty and unmeaning if it should permit such results.

In the case of *Merck v. Merck*, 83 S. C., 329; 65 S. E., 347; 137 Am. St. Rep., 815, a deed was in the usual form of a conveyance of land with warranty clause, except that it contains after the description of the property the following words:

"This deed is not to go into effect until after my death."

The words under consideration by us are:

They "are not to have possession nor is this deed to take effect until the youngest, Mary Thompson, shall become twenty-one years of age."

Citing *Williams v. Sullivan,* 10 Rich. Eq., 217, the Court held that the title to the property passed on execution of the paper, the right to the use and possession only being postponed until the death of Mrs. Sullivan (the grantor). The Court said:

"It does not strain the meaning of the words, 'This deed is not to go into effect until after my death,' to construe them in connection with the whole paper, as expressing the intention of the grantor to say, 'I do mean to make a good deed of conveyance to Laurence C. Merck, but I hold back from him for myself the beneficial rights of possession and enjoyment of the land while I live.'"

By the same token it would not strain the meaning of the words before us for construction to construe them in connection with the whole paper, as expressing the intention of the grantor to say:

"I do mean to make a good deed to the Thompson children, but I hold back from them for the benefit of myself and my estate the beneficial rights of possession and enjoyment of the land until the youngest shall have attained her majority."

The language used in the case relied on by the Circuit Judge (*Singleton v. Bremar's Adm'x,* 4 McCord, 12; 17 Am. Dec., 699) and the surrounding circumstances are very different from the language and circumstances of the present case. The language there was:

"I do hereby in case of my death give to Tabitha Singleton (a free brown woman my house and lot. * * *"

The Court said:

"The natural import of the terms used in the first part of this paper would unquestionably give it the effect and operation of a will."

A sale of property by the testator was said to be an ademption of the legacy. The Court held that no fee vested. The case is not an authority in point, except that it recognizes the undisputed principle of the common law that a

fee cannot be created to take effect in future. In the case under consideration the fee vested immediately, but the possession and use were reserved to S. M. Cox and his estate until the youngest grantee should attain her majority. The decree of the Circuit Judge is therefore in this particular modified.

The Circuit Judge did not pass upon the rights of George Cox, but the question is fairly raised by the pleadings and by the exceptions. We cannot, therefore, brush aside the question as uninmportant, but should decide it.

In view of the admissions made by George Cox as they appear from the testimony, he is in no position to assert any title under the deed in question. His claim is therefore denied.

The decree of the Circuit Court is modified in the particulars named.

· MR. CHIEF JUSTICE GARY, JUSTICE WATTS, and ACTING ASSOCIATE JUSTICE WILSON, concur.

MR. JUSTICE FRASER (dissenting) : The plaintiffs are the children and the defendants, Marion Thompson and Mary Thompson, are the grandchildren of the defendant, Samuel M. Cox. Samuel M. Cox owned a large tract of land. His wife died, and some, at least, of his children became restive for fear that he would marry again and dispose of his property in some way that would defeat their prospective inheritance. The children urged him to divide up his land so that their interests might be secure. He told them that if they would employ a surveyor he would divide the land. They did employ a surveyor and Mr. Cox showed the surveyor where to run the lines. Some time after the plats were made he took the plats to a neighbor and friend, Childress, who was a lawyer but not in active practice, and asked him to prepare the deeds, nine in all. Mr. Cox signed the deeds in the presence of two witnesses and left them in the possession of Mr. Chil-

dress.   How Mr. Childress was to hold them is the ques-
tion in this case.   This action was brought to declare the
delivery an absolute delivery, and that the title was in
the children and grandchildren, subject to a life estate in
Mr. Cox.    Mr. Cox denied that the delivery was absolute
and claimed that Mr. Childress was merely to hold the
deeds subject to his order, and to be delivered to the gran-
tees at his death, in case he did not withdraw them in his
lifetime.   The Circuit Judge found that the delivery was
absolute.   In argument the attorneys for the children and
grandchildren say there is one question of fact:

"Was the Circuit Judge in error in concluding as a mat-
ter of fact that the deeds were placed in the hands of
Childress by S. M. Cox with unconditional instructions to
deliver them to the grantees upon his death, and without
any reservation in S. M. Cox of the right to revoke or
recall them during his lifetime?"   There are only two wit-
nesses who testify as to what was said at the time of de-
livery, to-wit, Childress and S. M. Cox.

Childress testified that Cox said:

"Keep them until my death and deliver them to the
children."

He also testified:

"Q.   Mr. Childress, when Mr. Cox gave you those
deeds and told you to keep them, didn't he say, 'Keep them
for me until my death and then give them to my children?'
A.   He might have had it that way; I would not be cer-
tain; I would not be certain.   Q.   You would not swear
that he did not say that?   A.   No, would not."

Mr. Childress is very uncertain as to the language that
accompanied that delivery to him.   When Mr. Childress
was asked if Mr. Cox did not say that the reason the deeds
were left with him was that Mr. Cox had no place to keep
the deeds and he was afraid to keep them in his house for
fear that his children might get possession of them when
they came to clean up his house, Mr. Childress answered:

"I do not know whether he said that or not. Q. Well, if Mr. Cox testifies positively that he did say it, you would not deny it, would you? A. No; I would not deny it, for I don't remember."

Mr. Cox testifies that he left the deeds with Mr. Childress to hold for him (Cox); that he did not regard the deeds as anything more than postal cards to be withdrawn at his will; that at the time of the signing of the deeds and up to the time that this immediate controversy arose he never doubted his right to change his mind and recall the deeds from his attorney and friend; and that he had left the deeds with Mr. Childress as his attorney and friend so that he might be free in his disposition of the property. In order for the children to succeed, they must show the delivery was unconditional. They attempt to show that cardinal fact by one witness and that witness frankly states that he is uncertain as to what was said. Who was most likely to remember? Mr. Cox. There are only two witnesses as to the circumstances connected with the delivery—one confessedly uncertain; the other clear and positive. The weight of the testimony is clearly with Mr. Cox. Then as to the light from circumstances: When Mr. Childress was nearer to the facts in question than he was when he testified, he says that he moved from the neighborhood, but before going he offered to give up the custody of the papers, but Mr. Cox told him to keep them because he had no place to hide them from his children. Mr. Childress has delivered the papers to Mr. Mat Cox, a brother of S .M. Cox, and one deed to George Cox, a son of S. M. Cox, but always on the order of S. M. Cox, and we see in the record no evidence that the grantees were consulted as to their wishes in the matter. There is no evidence of an agreement between Mr. Cox. and his children that the deeds should be executed. Indeed, some of the grantees said the subject of deeds had not been spoken of between them and their father,

and George Cox, one of the grantees, signed a written state-
ment in which he expressly disavows any claim under the
deed to him.    It is reasonably clear that, when Mr. Cox
signed the deeds and left them with Mr. Childress, it was
his intention that after his death his children and grand-
children should take the land as set forth in the deeds, but
until he had done an irrevocable act he could change his
mind and change the disposition of the property.    Mr.
Cox further testifies that he had two propositions in con-
templation.    One was to make a will, and the other was
to make the deeds subject to his recall while he lived, and,
if not recalled while he lived, then to be delivered at his
death; that he considered the undelivered deeds the safer
way, as it would avoid a possible contest of his will.

From a layman's point of view, the explanation is rea-
sonable, but it is said that Mr. Cox treated the deeds as
absolutely delivered when his brother suggested the
delivery of the deeds to the grantees and a reconveyance
from them of a life estate.    This was a compromise ar-
rangement, and cannot have the effect of converting a pre-
vious conditional delivery into an absolute delivery.

It is said that Mr. Childress refused to allow Mr. Cox
to have a reservation of a life estate written into the deeds.
The record shows that the objection was based upon the
absence of the subscribing witnesses, and not on the ground
that Mr. Cox could not alter the deeds.

"The question in this case is: What was the intention of
Cox at the time he delivered the deeds to Childress?    The
surrounding circumstances throw little light on the ques-
tion in favor of an absolute delivery.    The circumstances
point the other way.    Mr. Cox makes a clear, positive,
reasonable statement.    Mr. Childress is confessedly un-
certain.

I see nothing in the record upon which to base a finding
that the children helped their father to accumulate this
property.    I cannot take a man's property from him, when,

as here, the direct positive testimony is in his favor, and the witness against him confessedly does not know.